**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ROBERT D. TURNER,<br><br>    Plaintiff,<br><br>    v.<br><br>ASRESAHEGN GETACHEW, *Doctor,*<br>KEITH K. ARNOLD, *Assistant Warden,*<br>NORTH BRANCH CORRECTIONAL<br>INSTITUTION,<br>MARY DOE, *Commissioner Division of*<br>*Correction,*<br><br>    Defendants. | Civil Action: BAH-22-3133 |

**MEMORANDUM OPINION**

On December 1, 2022, self-represented Plaintiff Robert D. Turner ("Turner") filed a civil rights Complaint pursuant to 42 U.S.C. § 1983, alleging denial of medical care.  ECF 1.  Defendant Asresahegn Getachew filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. ECF 15.  Defendants North Branch Correctional Institution ("NBCI"), Assistant Warden Keith Arnold, and Mary Doe, Commissioner ("Correctional Defendants"), also filed a Motion to Dismiss, or in the Alternative, for Summary Judgment.  ECF 20.[1]  Turner was advised of his opportunity to respond to the dispositive motions and the risks of failing to do so.  ECFs 16, 21. Turner filed a response in opposition.  ECF 22.  No hearing is necessary to determine the matters pending.  *See* Local Rule 105.6 (D. Md. 2023).  For the reasons stated below, Defendants' Motions are granted.

---

[1] Correctional Defendants also filed a Motion for Reconsideration of the Order granting Turner leave to proceed in forma pauperis.  ECF 17.  The Court disagrees with Correctional Defendants' analysis regarding the number of "strikes" under the PLRA accrued by Turner and as such the Motion is denied.

## I.      BACKGROUND

### A.  Turner's Allegations

In Turner's Complaint, ECF 1, he alleges that he suffers from a number of mental illnesses. *Id*. at 7–8.  He also states that he attempted suicide on a number of occasions in 2021 and 2022. *Id*. at 9–10.  He alleges that Defendants failed to "take steps to ensure that [he] received the needed treatment."  *Id*. at 11.  Turner also alleges that "Doctor Getachew and Assistant Warden Arnold and the commissioner[] refus[ed] to give [him] left knee surgery" for four years which caused him to suffer pain and serious depression and exacerbated symptoms of his mental illnesses.  *Id*. at 13–14.  In an administrative remedy procedure ("ARP") attached to the Complaint, Turner claims that Dr. Getachew denied him knee surgery even though another doctor had already approved the surgery.  ECF 1-1; ECF 1-2.  Turner seeks an injunction directing Defendants to provide him left knee surgery and to carry out whatever treatment he needs without delay.  *Id*. at 15–16.  He also seeks compensatory and punitive damages.  *Id*. at 16-17.

In his response, Turner highlights that medical staff allegedly promised on December 19, 2018 that if Turner was compliant with medical orders and refrained from self-harm for six months, then Turner could begin treatment for Hepatitis C Virus ("HCV") and would also receive knee surgery.  ECF 22, at 1.  Turner states that "even though it had not been six months since [Turner] harmed himself," he began HCV treatment in October of 2020.  *Id.*  He also said that on May 14, 2023, he underwent surgery at the University of Maryland "to close a self-inflicted wound."  *Id.* As of the date of the filing of his response, October 12, 2023, however, Turner reports that he had not engaged in self-harm for over eight months.  *Id.* at 2.  Despite allegedly not harming himself for over six months, Turner says he did not receive the knee surgery.  *Id.* at 2.

### B.  Defendants' Response

Defendants filed motions seeking dismissal of the Complaint or, in the alternative, summary judgment.  ECF 15-1; ECF 20-1.  Defendant Getachew explains that the complaint should be dismissed: (1) because Turner has failed to state a claim against Getachew; and (2) he is entitled to summary judgment.  Correctional Defendants argue that the complaint should be dismissed: (1) because they are immune from suit under the Eleventh Amendment; (2) NBCI is not a person within the meaning of § 1983; (3) there is no allegation that Defendants Arnold and Doe personally participated in the claimed constitutional violation; (4) they are entitled to summary judgment; (5) there is no respondeat superior liability under § 1983; (6) they are entitled to qualified immunity; and (7) Turner's request for injunctive relief should be denied.

In support of his Motion, Defendant Getachew submitted his own declaration as well as portions of Turner's medical records.  ECF 16-2 (Getachew Decl.); ECF16-3; 16-4; 16-5; 16-6 (Medical Records).   In support of their Motion, Correctional Defendants have submitted declarations from Assistant Commissioner of Correction Laura Armstead, ECF 20-2, Assistant Warden Keith Arnold, ECF 20-3, and portions of Turner's ARP record, ECF No. 20-4.

Asresahegn Getachew, M.D. explains that from January 1, 2019, until January 11, 2020, he was employed by Corizon Health Inc., ("Corizon") at Baltimore Central Booking and Intake Center and on January 11, 2020, he transferred to Western Correctional Institution ("WCI"), where he also sees patients from NBCI via telemedicine.  ECF 15-2, ¶ 2.  During an unspecified period of time, there was no Regional Medical Director ("RMD") at WCI or NBCI and Dr. Getachew acted as RMD.  *Id*. ¶ 3.  As acting RMD, Dr. Getachew took on additional duties which included reviewing nonformulary drug requests submitted by onsite providers and reviewing recommendations made by Utilization Management ("UM").  *Id*.  UM is responsible for reviewing

3

requests for offsite specialty appointments and diagnostic testing submitted by onsite providers. *Id*.   Dr. Getachew, as RMD, was also responsible for reviewing Alternative Treatment Plans ("ATPs").   He was not responsible for approving or denying consultation requests.   *Id*.

Dr. Getachew avers that he never denied any request by Turner for knee surgery and explains that Dr. Getachew is not part of UM and is not responsible for reviewing consultation requests for surgical procedures.   ECF 15-2, at 3 ¶ 6.

Turner was diagnosed with bursitis and referred for a bursectomy in February of 2018.   *Id*. Dr. Getachew explains that bursitis is a condition that effects the bursae (small, fluid-filled sacs) that cushion bones, tendons, and muscles near the joints.   *Id*. ¶ 7.   Bursitis occurs when the bursae are inflamed.   *Id*.   Symptoms of bursitis include achiness, joint stiffness, pain when moving or pressing the area, swelling, and a red appearance.   *Id*.   Bursitis is most commonly caused by repetitive motions or positions that put pressure on the bursae around a joint.   *Id*.   Bursitis can also be caused by injury or trauma, inflammatory arthritis, gout, or infection.   *Id*.   Dr. Getachew explains that, generally, bursitis gets better over time and conservative measures like rest, ice, and pain relievers can ease the discomfort.   *Id*.   If conservative treatment fails, other options to treat bursitis include antibiotics (when the bursitis is caused by an infection), physical therapy, corticosteroid injections, assistive devices for ambulation, surgery to drain the inflamed bursa, or on the rare occasion removal of the bursa.   *Id*.

Given Turner's cardiac history, including the placement of a pacemaker, he required medical clearance by a cardiologist before the knee surgery could be scheduled.   *Id*. ¶ 6. Additionally, other concerns surrounded the scheduling of knee surgery for Turner, who has a long history of self-harm, including cutting and thus care providers were concerned he would pull out his sutures.   *Id*. at 3–4 ¶¶ 6, 8.

4

Review of Turner's medical records for the relevant time period demonstrates that on January 5, 2018, while housed at Patuxent Correctional Institution ("PCI"), Turner cut himself on his left upper anterior forearm.  ECF 15-6, at 12–14.

On February 17, 2018, while still housed at PCI, Dr. Ali Yahya performed an aspiration of Turner's prepatellar joint fluid.  ECF No. 15-6 at 9-11.  That same day, Dr. Yahya submitted a consultation request for orthopedic and cardiology consults.  *Id*. at 5-8.  Dr. Yahya noted that Turner had previously undergone orthopedic surgery in 2016, *id.* at 5, and was scheduled for revision surgery in July of 2018, but the surgery was postponed due to bradycardia, *id.*, and "for prior pacemaker interrogation and cardiology clearance."  *Id.* at 7.  He noted that the anesthesiologist recommended cardiology clearance because Turner had a pacemaker for a Type 1 heart block.  *Id*. at 5.  He also noted that Turner had recurrent accumulation of fluid in his left knee.  *Id*. at 7.

While confined at NBCI, Turner was seen by Registered Nurse ("RN") Sage on April 28, 2018, for a suicide attempt that resulted in multiple lacerations on Turner's neck, chest, arms, and hands.  ECF 15-6, at 1–4.  Turner was sent to the emergency room for further treatment.  *Id*.

Nurse Practitioner ("NP") Holly Hoover saw Turner on June 29, 2018, after Turner cut himself because Turner wanted to see an orthopedic specialist that day.  ECF 15-5, at 44–45.  Orthopedist Roy Carls, M.D. also saw Turner on the 29th.  ECF 15-6, at 15.  Dr. Carls recounted Turner's relevant medical history and noted that Turner had undergone several surgeries before and the bursa "had come back."  *Id.*  Dr. Carls also noted that Turner was scheduled for surgery "this past year, but [Turner] had cardiac issues and now has a pacemaker."  *Id*.  Dr. Carls believed that Turner could eventually have the requested surgery.  *Id.*  An examination of Turner's left knee

revealed a prepatellar bursa with no signs of infection. *Id.* Dr. Carls noted that Turner "will require a prepatellar bursectomy of the left knee." *Id.*

On July 3, 2018, Turner was seen by RN Kleptich for lacerations. ECF 15-5, at 41. Turner used a sharpened plastic spoon to gouge a deep laceration in both antecubital ("AC") areas (the front of the elbow). *Id.* Turner was taken to the emergency room for treatment. *Id.*

The next day, Turner was discharged from the WCI infirmary to NBCI. *Id.* at 39–40. It was noted that he had been seen in the emergency room on July 3, 2018, and had his wounds sutured. *Id.* at 39. Turner initially stated that he harmed himself because he felt he was not getting medical treatment—specifically, the pacemaker interrogation and left knee surgery. *Id.* He also stated that he wanted to see someone in psychiatry because he believed he should be prescribed Elavil. *Id.* Turner had removed some of the sutures in his arms. *Id.* NP Clark reminded him that he had been seen by an orthopedist on June 29, 2018, and the requested cardiology follow up was pending. *Id.*

On November 21, 2018, NP Opel saw Turner during infirmary rounds. *Id.* at 33–34. Turner reported that he thought he was being sent out to see a cardiologist but instead was transferred to another facility. He was upset that he did not see the cardiologist, and so he injured his left AC with a paint chip, inflicting a deep wound. He was sent to the hospital and seen by a vascular surgeon who repaired the wound. He spent the night at Jessup Correctional Institution ("JCI") and was sent back to the WCI infirmary on November 19, 2018. *Id.* Opel noted that the day before Turner had used a plastic spoon to remove his stitches. He was covered in blood and the wound was gaping. *Id.* The provider sutured the wound and sent Turner back to the emergency room for further evaluation. *Id.*

NP Opel saw Turner on December 4, 2018, for suture removal. *Id.* at 31–32. During the visit, Turner asked when he would have left knee surgery. Opel noted that he needed to be cleared by cardiology first and he had been scheduled to have a cardiology appointment, but it needed to be rescheduled. Opel contacted the scheduler who advised that they would schedule Turner for the consult. *Id.*

RN Ventura saw Turner on December 7, 2018, for a self-imposed laceration of the left AC. *Id.* at 28. Turner stated he used a piece of metal he found to cut himself. *Id.* He was sent to the emergency room for sutures. *Id.*

On December 12, 2018, the interdisciplinary team convened for a plan of care conference regarding Turner's self-harming behaviors. *Id.* at 26–27. Dr. Getachew, along with NP Hoover, NP Opel, Assistant Director for Nursing ("ADON") William Beeman, RN Dawn Showalter, LPN Travis Barnhart, Chronic Care Clinic ("CCC") LPN Lori Keister, and Lauren Beitzel from psychology, attended the patient care conference along with Turner. *Id.* at 25.

During that December 12, 2018, team meeting, NP Opel noted Turner's history of self-mutilation and his diagnosis of borderline personality disorder. *Id.* at 26. She noted that Turner had a tendency to self-harm when he was upset or angry about something. *Id.* Turner had recently cut his left AC "because he missed a cardiology appointment." *Id.* He was sent to the University of Maryland Medical System (UMMS) to see a vascular surgeon to have the laceration repaired. *Id.* However, "[w]ithin a couple of hours, he pulled out the sutures which resulted in [Turner] having new sutures placed." *Id.* Turner later caused a new laceration in the same location requiring him to again be sent to the emergency room for sutures. *Id.* Turner reported "several health issues that he is currently angry about," including Hepatitis C Virus ("HCV") treatment and knee pain. *Id.* Turner requested HCV treatment, but it was noted that he could not be treated until

7

he proved he was "mentally stable and [] compliant with his medical treatment." *Id.* It was again noted that Turner had been self-harming, was not taking prescribed medications, and was not seeing the psychiatrist. *Id.* It was recounted in the team meeting that Dr. Carls had opined, on February 17, 2018, that Turner needed a bursectomy, but first had to be cleared by cardiology. *Id.* Again, the concern about Turner pulling out sutures if any additional surgery was performed was noted. *Id.* Ultimately, the team determined that Turner could receive both the HCV treatment and knee surgery in six (6) months if he remained compliant with his medical treatment and did not cause more self-injury. *Id.* Turner "was educated about the plan" and purportedly stated that "he understood" it, however the team noted that Turner was "not happy" with the decision. *Id.* at 26. However, on December 19, 2018, Turner again met with a care team who repeated that if Turner would "be compliant with all medical orders and refrain from self-harm for 6 m[onths], [Turner] would be started on HCV . . . treatment, and for knee surgery." *Id.* at 25. Turner was "reminded [that] compliance includes all medication, sick call, Provider appt., lab work, Psych and psychology appt." *Id.* Turner was "agreeable to these terms and reported he would remain compliant and not miss any app[ointments] or medication for 6 mo[nths]." *Id.*

On December 25, 2019, RN Swan evaluated Turner for a self-inflicted laceration to the left AC with significant blood loss. ECF No. 15-5 at 22-23. He was sent to the emergency room via ambulance and remained hospitalized from December 25 to December 28. He had moderate anemia which required a blood transfusion. *Id.* at 20. On December 29, 2019, he cut the stitches out of his left arm requiring his return to the emergency room. *Id.*

On January 1, 2019, Corizon became the contractual medical provider for the Department of Public Safety and Correctional Services. ECF No. 15-2, ¶ 21.

Turner was discharged from the WCI infirmary to NBCI on January 4, 2019.  ECF No. 15-5, 20–21.  He was next seen by RN Kleptitch and NP Opel on January 30, 2019, after he cut his left arm.  *Id*. at 14–19.  He stated he cut his arm with a staple because he was "bored."  *Id*. at 17.  The laceration was sutured, and he was taken back to the WCI infirmary.  *Id*.  Kleptitch saw Turner again on February 1, 2019, for another laceration on his left forearm where Turner had apparently removed the recently placed sutures to the point where "vessals [sic] and tendons" were exposed.  *Id*. at 8.  He was again sent to the WCI infirmary to have the wound sutured.  He advised NP Clark that he "cut himself with a spoon that was given to him."  *Id*. at 11.  After Clark consulted with psychology staff, Tuner was returned to NBCI under suicide precautions and with an observational aide.  *Id*.

On February 20, 2019, RN Ventura saw Turner for self-inflicted cuts on his neck and both forearms.  ECF 15-5, at 5.  He reported that he cut himself because no one was telling him "why [he was] so tired all the time."  *Id.* at 5.  He reported that he used a spoon to cut his arms and neck so that he "would feel better."  *Id.*  He was sent to the emergency room for suturing.  *Id.*  He was seen again for self-inflicted lacerations or for opening his wounds on March 2, March 9, March 22, May 1, July 3, and July 9, 2019.  ECF 15-2, at 9 ¶ 24;[2] ECF 15-5, at 2.

On July 6, 2019, Turner saw NP Clark in the WCI infirmary.  ECF 15-2, at 9 ¶ 24.  Turner reported that "he gets agitated by all the yelling and antics by other inmates at NBCI."  *Id.*

Turner was again seen by NP Clark on July 13, 2019, at the WCI infirmary.  ECF 15-2, at 10 ¶ 25.  Turner had "an interrogation of his pacemaker with a finding of re-entry tachycardia"

---

[2] Multiple portions of Turner's medical records filed at ECF 15-4 had no writing on the page.  *See, e.g.*, ECF 15-4, at 20–50.  As such, where records are apparently unavailable, the Court relies on Dr. Getachew's declaration, which provides specific times and dates of relevant encounters with medical staff.  *See* ECF 15-2.

and his pacemaker was adjusted. *Id.* It was noted that Turner's chronic health issues included prepatellar bursitis but NP Clark recounted in her notes that Turner was "seen by orthopedics in June of 2018" and that "he would need a bursectomy." *Id.* However, NP Clark noted that the scheduling of that surgery "was complicated by self-injury." *Id.*

RN Long saw Turner at PCI on September 22, 2019, after Turner "cut his right arm AC and had substantial blood loss." *Id.* at ¶ 26. Turner was taken to the hospital by paramedics. *Id.* On December 13, 2019, Turner again saw RN Long after Turner "cut his right AC with a soda can." *Id.*

Dr. Andrew Moultrie evaluated Turner at PCI on December 18, 2019, for chronic care. ECF 15-2, at 10 ¶ 27. Dr. Moultrie noted that Turner "has a history of a heart block requiring a pacemaker." *Id.* Turner "did not complain of chest pain or palpitations" and "was due for a pacemaker interrogation the following month." *Id.* Dr. Moultrie also noted Turner's history of HCV infection and referred Turner for a treatment evaluation. *Id.* Lastly, Dr. Moultrie observed that Turner had prior issues "with urethral stricture," underwent a transurethral needle ablation in 2014, and was approved for a transurethral incision for bladder neck contracture but that procedure was yet to be scheduled. *Id.*

On January 5, 2020, Turner was found at PCI, "covered in blood after he cut deep through the skin, exposing ligaments and bone in the left wrist, inner arm, and both AC areas." ECF 15-2, at 10–11 ¶ 28. He was sent to the hospital. *Id.* After Turner returned to PCI, he was seen by RNP Deressa at the Jessup Regional Infirmary ("JRI") and allegedly reported that he cut himself with a piece of concrete "because he had not been treated with psychiatric medications and also because his team lost the game last night." *Id.*

10

On May 9, 2020, Turner saw LPN Budu after cutting both ACs with a plastic medication cup.  ECF 15-2, at 11 ¶ 29.  The following week he was seen by RN Massalla after he used a cement block to cut his neck.  *Id.*  He was again sent to the emergency room.  *Id.*

Dr. Getachew saw Turner via telemedicine for a chronic care clinic.  *Id.* ¶ 30.  Dr. Getachew noted Turner's relevant medical history of HCV, hypertension, and sick sinus syndrome for which he had been provided a pacemaker.  *Id.*  Dr. Getachew also noted that "the last pacemaker interrogation was in December" and Dr. Getachew referred Turner to cardiology for evaluation and interrogation.  *Id.*  Turner also noted a history of peptic ulcer disease and complained of abdominal pain.  *Id.*  Dr. Getachew renewed his medications.  *Id.*  Turner also had a history of an enlarged prostate (BPH) and Dr. Getachew requested the nurse obtain the pathology report form a cystoscopy done on June 6, 2020.  *Id.*  Dr. Getachew also reviewed Turner's lab work and noted that Turner did not complain of knee pain during the visit.  *Id.*

Dr. Getachew again saw Turner via telemedicine on September 1, 2020.  *Id.* ¶ 31.  Dr. Getachew again noted Turner's history of HCV, hypothyroidism, hypertension, sick sinus syndrome with pacemaker, peptic ulcer disease and BPH.  *Id.*  Dr. Getachew also noted that Turner "had bladder sphincter dysfunction and was referred to a urologist and scheduled for urodynamic studies, but this was not completed due to a suspected urinary tract infection."  *Id.*  Turner also had a stomach ulcer and Dr. Getachew ordered that Turner's prescription for Prilosec be increased and labs ordered.  *Id.*  Again, Turner did not complain of knee pain during this visit.  *Id.*

On October 12, 2020, Dr. Getachew again saw Turner via telemedicine.  *Id.* at 12 ¶ 32.  Dr. Getachew noted that UM did not approve a consult request for urodynamic studies and requested additional information.  *Id.*  Dr. Getachew advised the nurse to send the additional information to receive authorization for the urodynamic studies.  *Id.*

11

On October 19, 2020, Turner was again seen by Dr. Getachew via telemedicine for follow up regarding the urology consult request. *Id.* ¶ 33. Turner complained of dandruff and Dr. Getachew ordered coal tar shampoo. *Id.*

NP Hoover saw Turner on January 28, 2021, after he completed treatment for HCV. *Id.* ¶ 34. "His viral load was not detected, indicating a successful treatment." *Id.*

Dr. Getachew next saw Turner on March 3, 2021, via telemedicine for chronic care. *Id.* ¶ 35. Dr. Getachew reported addressing Turner's "bladder sphincter dysfunction, sick sinus syndrome, and history of stomach ulcer." *Id.* Turner did not complain of knee pain. *Id.*

On April 1, 2021, Dr. Getachew saw Turner via telemedicine for chronic care. *Id.* ¶ 36. Turner's bladder obstruction, heart block, hypothyroidism and HCV were addressed. *Id.* At this visit, Turner complained of chronic knee pain due to arthritis and Dr. Getachew "educated him about the importance of exercise and renewed his Tylenol." *Id.*

On May 25, 2021, NP Hoover saw Turner for an apparently self-inflicted laceration. *Id.* at 13 ¶ 37. Later, RN Stella Fetters evaluated Turner on June 14, 2021, after Turner purportedly "swallowed a nail." *Id.* RN Fetters contacted Dr. Getachew who directed Turner to be admitted to the infirmary "for pre-op prep." *Id.*

Turner was again seen by Dr. Getachew on June 24, 2021, via telemedicine. *Id.* ¶ 38. Turner had been scheduled to see Dr. Getachew and the psychiatrist "because [Turner] refused to go to the infirmary for his preop preparation." *Id.* Turner reportedly claimed "that nurses did not respond to his needs" in the infirmary, whereupon Dr. Getachew reassured Turner that his medical needs would be met in the infirmary. *Id.* Turner was then admitted for "pre-op prep." *Id.*

On July 17, 2021, RN Robinson saw Turner for cuts to Turner's arms. *Id.* ¶ 39. RN Robinson noted Turner's "long history" of self-harm and that Turner had received stiches on "the

same spot" of his arm on June 16, 2021.  *Id.*  Turner reported he used a plastic spoon to open his wounds.  *Id*.

Turner was seen again by Dr. Getachew on September 9, 2021, via telemedicine.  *Id.* ¶ 40. Turner's cardiology issues, BPH, hypertension and chronic knee pain due to bursitis were addressed.  *Id.*  Dr. Getachew recommended that Turner be referred to an onsite provider for further reevaluation and management of his knee pain.  *Id*.

Dr. Getachew again evaluated Turner via telemedicine on September 20, 2021.  *Id.* at 13– 14 ¶ 41.  LPN Keister assisted in the examination.  *Id.*  Turner had abnormal labs which indicated low sodium, and he reported diarrhea and vomiting.  *Id.*  Turner reported that his symptoms improved with Pepto-Bismol.  *Id.*  Turner was admitted to the infirmary "to repeat the metabolic panel and observation until sodium was normal."  *Id.*  Dr. Getachew notes that Turner "was sent to the WCI infirmary but refused to stay and was returned to NBCI."  *Id*.

Turner underwent a transurethral resection of the prostate at the University of Maryland on October 21, 2021, and he reported feeling better.  *Id.* at 14 ¶ 42.  On November 16, 2021, Dr. Getachew saw Turner via telemedicine for chronic care.  *Id.*  Dr. Getachew submitted a consultation request for follow up and generated a consultation for another pacemaker interrogation.  *Id.*  Turner's other chronic issues were addressed and his labs reviewed.  *Id.*  Turner did not complain of knee pain during this visit.  *Id*.

Dr. Mehta saw Tuner on November 26, 2021, for "left heel skin breakdown."  *Id.* ¶ 43.  Dr. Mehta also discussed Tuner's left knee bursitis and reassured Turner "that there was no swelling or fluctuation."  *Id*.

RN Massalla saw Tuner on January 30, 2022, for an apparently self-inflicted wound with "profuse bleeding."  *Id.* ¶ 44.  Turner "reported using a concrete block to cut himself because he

13

'wanted to bleed.'" *Id*. Dr. Getachew was notified and directed that Turner be sent to the emergency room via 911. *Id*. Turner received stitches in the emergency room and was returned to the prison infirmary where he allegedly "ripped [out] the stitches and was sent back to the [emergency room]." *Id*.

On February 9, 2022, Dr. Getachew saw Turner via telemedicine with the assistance of LPN Keister. *Id.* at 15 ¶ 45. Turner asked to have his Keep on Person ("KOP") medication returned but Keister stated that he had been receiving them through Direct Observation Therapy ("DOT") because he had been having issues with self-harm. *Id*.

PA Negussie saw Turner on March 29, 2022, for another allegedly self-inflicted wound. *Id.* ¶ 46. PA Negussie observed that Turner had a two-day old laceration on his right testicle after Turner allegedly used staples to cut himself. *Id*. No discharge was observed, minimal blood was present, and there was no sign of infection. *Id*.

RN Coffman saw Turner on April 16, 2022, because Turner allegedly used a razor blade to cut his left AC. *Id.* ¶ 47. Dr. Getachew was notified and directed that 911 be called. *Id*. The following day, NP McLaughlin saw Turner in the WCI infirmary. *Id*. Nurse McLaughlin noted that Turner had been sent to the hospital for a self-inflicted laceration to his left forearm and received eight sutures. *Id*. Turner allegedly told Nurse McLaughlin that his "anger started [because he was] on a tier without programming to better himself." *Id*. Turner apparently agreed to return to NBCI. *Id*.

Dr. Getachew again saw Turner via telemedicine on April 19, 2022. *Id.* ¶ 48. Turner complained of numbness in his left hand and Dr. Getachew observed that Turner may have damaged the nerve in the left forearm by cutting himself. *Id*. Tuner also complained of knee pain. *Id*. Dr. Getachew noted Turner's "history of left knee bursa for which he had multiple surgeries."

*Id.*  On further examination, an older surgical scar was observed on Turner's left knee.  *Id.*  No signs of infection or bursa were noted, and Dr. Getachew determined that Turner's prepatellar bursitis was stable.  *Id.*  Turner's left arm laceration was covered with dressing and Dr. Getachew directed the nurse to monitor the wound and report if there were any signs of infection.  *Id.*

Tuner was seen by PA Negussie on May 2, 2022.  *Id.* at 16 ¶ 49.  Turner had an open wound on the left arm about 5 cm in length with redness and oozing.  *Id.*  Turner also complained of right heel dry skin which had improved since he was last seen.  *Id.*  Turner requested to be seen for surgery on his left knee bursitis, which PA Negussie noted was not at that time "an active problem."  *Id.*  PA Negussie examined Turner and did not observe any swelling, redness, or tenderness of the knee and that Turner had intact range of motion.  *Id.*  PA Negussie directed that daily wound care continue.  *Id.*

Dr. Getachew evaluated Turner on May 10, 2022.  ECF 15-4, at 11.  Dr. Getachew addressed Turner's open wound and noted that the wound was properly bandaged.  *Id.*  Records appear to reflect that a second visit occurred the same day, where Dr. Getachew evaluated Turner's urinary and cardiac issues as well as issues related to hypertension and hypothyroidism.  *Id.* at 7.  Dr. Getachew also reviewed Turner's labs and medications.  *Id.*

RN Massalla saw Turner on June 4, 2022, after it was Mr. Turner reported that he "swallowed a crew and particle of light b[ulb] and also intentionally hit [his] head on the wall."  ECF 15-4, at 4.  Turner reported he did these things "because [he] wanted to see how it feels."  *Id.* at 5.  Psychology was consulted and Turner was transferred to an observation cell with suicide smock and one on one observation.  *Id.*

Dr. Getachew again evaluated Turner via telemedicine on June 6, 2022, to address Turner's continued self-injurious behavior.  ECF 15-3, at 51.  Turner reported that he "swallowed glass and

[a] nail" because he was "upset by the noise on his housing unit." *Id.* Turner denied abdominal pain, nausea, or vomiting. *Id.* Dr. Getachew ordered an x-ray of Turner's abdomen and directed further monitoring. *Id.* Though Turner reported that he was no longer suicidal, Dr. Getachew advised the nurse to keep Turner on suicide observation until cleared by psychology. *Id.*

On July 6, 2022, after purportedly using a piece of concrete to cut his right arm, Turner was seen by RN Budu. ECF 15-3, at 50. Turner stated "[t]hey are not giving me the right kind of medicine so I used the wall to cut myself." *Id.* at 49. Dr. Getachew was notified and ordered that Turner be sent to the emergency room for evaluation and sutures. *Id.* at 50.

Tuner saw PA Negussie on August 3, 2022, for a scheduled visit. ECF 15-3, at 44. Turner asked about his left knee surgery, stating that he had one surgery before and was told he should have a second one. *Id.* PA Negussie reassured Turner that there was "no indication for surgery on his left knee." *Id.* Upon examination, PA Negussie found no redness or swelling on the knee and remarked that Turner had an intact range of motion. *Id.*

LPN Barnhart evaluated Tuner on August 6, 2022, after he cut his neck and right forearm with a staple. ECF 15-3, at 42. Dr. Getachew was notified and directed Turner be sent to the hospital via ambulance. *Id.* Two days later Dr. Getachew saw Turner for a provider visit. *Id.* at 38. Turner stated that he was feeling better and denied suicidal thoughts. The neck wound was sutured and there were no signs of infection. Dr. Getachew directed daily dressing changes and that the sutures be removed in 10 days. *Id.*

Dr. Getachew next saw Turner on September 12, 2022, after Turner reported swallowing a stone "because he was not happy with his housing unit." ECF 15-3, at 34. Turner reported that he had passed the stone and did not have any abdominal pain, nausea, or vomiting. *Id.* Dr. Getachew remarked that "[t]he patient is a well-known self-injurious patient who" showed "no

evidence of an acute abdomen." *Id.* Dr. Getachew determined that "[n]o further work-up is needed." *Id.*

On October 13, 2022, Turner was seen by Dr. Getachew, with the assistance of LPN Keister, via telemedicine for chronic care. ECF 15-3, at 24–33. Turner's urinary and cardiac issues were addressed as well as his hypertension and hypothyroidism. *Id.* Turner reported stomach pains, headaches, and left heel pain. *Id.* at 29. Turner did not report any knee pain. *Id.* Records reflect that Turner reported "chronic cutting since" the age of five, and that Turner would use "any object, including [a] broken button, paint chip, small rock, [etc.]" to harm himself. *Id.* at 25. It was noted that Turner had attempted to cut his pacemaker out and had multiple scars on both arms. *Id.*

PA Negussie saw Turner on October 31, 2022, for a health assessment. ECF 15-3, at 18. Negussie noted that Turner was 50 years old and had a history of recurrent self-inflicted injuries, chronic pain, hypertension, AV block with pacemaker in place, hypothyroidism, and prostate surgery. At the time of the exam, Turner did not have any complaints. *Id.* PA Negussie noted that Turner had been seen for his cracked heel and was waiting for a special lotion. *Id.* PA Negussie also noted that Turner had a pacemaker interrogation on July 6, 2022, and noted that Turner's pacemaker had 3.5 years of battery life remaining on it. *Id.*

NP Clark saw Turner on November 2, 2022, for evaluation of a wound. ECF 15-3, at 14. Turner reported using "a piece of concrete" to cut himself because he was not receiving "the psych[iatric] med[ications] and programming he want[ed]." *Id.* NP Clark applied nine sutures. *Id.*

On December 7, 2022, Lauren Beitzel, LCPC, noted that while conducting rounds on the tier, Turner told her that he needed to come to medical. ECF 15-3, at 12. When she asked why,

Turner purportedly "turned on the cell light and [Beitzel] observed blood on the cell walls." *Id.*

Beitzel reported that Turner then stated that "he had cut himself and began to laugh." *Id.* Beitzel

notified the escorting officer who called for assistance. *Id.* Turner was evaluated by medical staff

who cleaned and bandaged his wounds. *Id.* An examination revealed that Turner had cut his left

arm near the elbow with an unknown object. *Id.* Turner asked to contact a family member and

noted that he was "angry about not receiving rec earlier in the day." *Id.* "Orders were given for

[Turner] to be placed on suicide precautions in a holding cell with an IOA in a security garment

upon returning to NBCI." *Id.*

RN Morton saw Turner on December 12, 2022, for a dressing change. ECF 15-3, at 11. A

large amount of dried blood was observed on Turner's AC site with no dressing. *Id.* A wound

was observed, cleaned, and dressed. *Id.* RN Morton spoke with PA Negussie and was instructed

to call Dr. Getachew. *Id.* Dr. Getachew ordered that Turner be admitted to the infirmary and be

provided Bactrim, an antibiotic. *Id.* Turner was eventually sent to the emergency room. *Id.* at 7.

Dr. Getachew denies ignoring Turner's medical needs, and states as follows:

> I never ignored the patient's medical needs, and I never denied left knee surgery as
> he claims. The patient was recommended for surgery in 2018, but he was unable to
> stop cutting himself long enough to permit him to go out and have the surgery. As
> time went on, the bursa was no longer inflamed, and the patient did not need
> surgery.

ECF 15-2, at 19 ¶ 62.

## C. Correctional Defendants

Assistant Commissioner of Correction Laura Armstead explains that from May 22, 2022,

through November 23, 2022, she served as Acting Assistant Commissioner of Correction and on

April 15, 2023, was promoted to her current role. ECF 20-2, at 1 ¶ 1. In both roles, Armstead had

the authority to review appeals of administrative remedy complaints (ARPs) filed by inmates. *Id*. at ¶ 2.

Keith Arnold has served as Assistant Warden at NBCI since February 2021 and in that role may review and make decisions on ARPs filed by inmates. ECF 20-3, at 1 ¶ 1

Neither Armstead nor Arnold, or any other correctional staff, have any personal involvement in providing medical care to inmates nor do they have the authority to make any decision concerning an inmate's medical care. ECF 20-2, at 1 ¶ 3; ECF 20-3, at 1 ¶ 2. Medical care for NBCI inmates is provided by a private medical contractor. ECF 20-2, at 1 ¶ 3; ECF No. 20-3, at 1 ¶ 2.

Armstead and Arnold both note that inmates may fill out a sick call slip to seek medical assistance and treatment. ECF 20-2, at 2 ¶ 4; ECF 20-3, at 1–2 ¶ 3. The sick call slips are reviewed by the private medical contractor who determines appointment dates and times for the inmate. *Id*. Armstead and Arnold note that neither they, nor other correctional staff have control over the determination of "whether, in response to a sick call slip, the medical provider examines the inmate, sets up a time for appointment, or [to choose] the time selected for an examination or appointment." *Id*.

Armstead and Arnold each explain that when responding to inmates' original ARPs or ARP appeals regarding medical care, they each rely on the reports, assessments, and judgments of trained medical staff. ECF 20-2, at 2 ¶ 5; ECF 20-3, at 2 ¶ 4. Armstead and Arnold each deny interfering with, hindering, or delaying medical care to Turner and each state that they are not aware of any time where correctional staff interfered with, hindered, or delayed medical care to Turner. ECF 20-2, at 2 ¶ 6; ECF 20-3, at 2 ¶ 5.

On June 13, 2022, Turner filed an ARP complaining that Dr. Getachew refused to schedule him for surgery even though Dr. Carls had approved the procedure.  ECF 20-4, at 9.  The ARP was dismissed by Arnold on July 11, 2022, with a notation that investigation revealed there was no record of his being recommended for knee surgery.  *Id.*  Turner was advised that he would be scheduled to see a health care provider so that his concerns could be addressed.  *Id.*

On August 11, 2022, Turner filed an ARP appeal, again alleging that he was recommended for knee surgery but over a year had passed without the necessary surgery.  ECF 20-4, at 5.  He complained that his knee was swollen, and he suffered pain which worsened daily.  *Id.*  Turner stated that he had difficulty walking and demanded immediate surgery and compensatory and punitive damages.  *Id.* at 4–6.

On September 16, 2022, Armstead dismissed Turner's ARP Appeal, advising Turner that "[t[here is no documentation that a consult was placed and no recommendation for surgery was made."  *Id.* at 3.  It was also noted that Turner had been seen by a provider who explicitly told Turner "that there is no need for surgery."  *Id.*

## II.     STANDARD OF REVIEW

Defendants argue that the Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), or that summary judgment should be granted in their favor pursuant to Fed. R. Civ. P. 56.  Defendants' motions are styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  Motions styled in this manner implicate a court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011).  Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where plaintiff has "actual notice" that the motion may be disposed of as one for

summary judgment.  *See Laughlin v. Metropolitan Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998).  When a movant expressly captions its motion to dismiss or "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur as the court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261.

Because Defendants filed their motions as a motion to dismiss, or in the alternative, for summary judgment, Turner was on notice that the Court could treat the motions as seeking summary judgment.  Accordingly, the Court will review Turner's claims against Defendants under the Rule 56(a) standard and will consider the exhibits filed in support of the dispositive motion.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 603 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).  Accordingly, "the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment

. . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and

draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per

curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility

determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing

*Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)).  For this reason, summary

judgment ordinarily is inappropriate when there is conflicting evidence because it is the function

of the factfinder to resolve factual disputes, including matters of witness credibility.  *See Black &*

*Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton*

*Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from

proceeding to trial."  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir.

2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)).  "The existence of a mere

scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials,

without more, are insufficient to withstand a summary judgment motion."  *Progressive Am. Ins.*

*Co.*, 603 F. Supp. 3d at 373 (citing *Tom v. Hospitality Ventures LLC*, 980 F.3d 1027, 1037 (4th

Cir. 2020)).

The Court is mindful, however, that Turner is a self-represented litigant.  A federal court

must liberally construe pleadings filed by pro se litigants to allow them to fully develop potentially

meritorious cases.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  But liberal construction does

not mean a court can ignore a clear failure in the pleadings to allege facts which set forth a claim.

*See Weller v. Department of Social Services*, 901 F.2d 387, 391 (4th Cir. 1990).  A court cannot assume the existence of a genuine issue of material fact where none exists. Fed. R. Civ. P. 56(c).

## III.   DISCUSSION

### A.  Personal participation

Turner alleges that the Correctional Defendants dismissed his grievance.  However, it is well settled that liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation.  *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).  Mere review of inmate grievances is insufficient to state a claim because, in short, the denial of a grievance does not alone give rise to liability.  *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (noting the allegation that warden "rubber stamped" grievances was not enough to establish personal participation) (citing *Whitington v. Ortiz*, 307 F. App'x 179, 193 (10th Cir. 2009)); *Whitington*, 307 F. App'x at 193 ("[D]enial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations.")

To the extent Turner seeks to hold the Correctional Defendants liable solely because of their supervisory roles, those claims also cannot proceed.  The doctrine of respondeat superior does not apply in § 1983 claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (disclaiming respondeat superior liability under § 1983).[3]  Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v.*

---

[3] *Respondeat superior* is a legal doctrine that provides an employer is liable in certain instances for the wrongful acts of an employee.  *See Black's Law Dictionary* (8th ed. 2004).

*Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

Ultimately, to establish supervisory liability under § 1983, the plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). At this early stage of litigation, the plaintiff must allege facts that, if proven, would establish such liability. Turner has failed to plead such facts as he points to no action (or inaction) on the part of supervisory defendants that resulted in a constitutional injury. As such, Defendants Arnold and Doe are entitled to dismissal.

### B.  Eleventh Amendment Immunity

Turner raises constitutional claims against state employees as well as against state agency North Branch Correctional Institution. Under the Eleventh Amendment of the United States Constitution, a state, its agencies, and its departments are immune from citizen suits in federal court absent state consent (or Congressional action). *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Claims against *state* employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *See Brandon v. Holt*, 469 U.S. 464, 471–72 (1985). The State of Maryland has not waived such immunity for claims of constitutional violation brought under § 1983. *See Pevia v. Hogan*, 443 F. Supp. 3d 612, 632 (D. Md. 2020). Accordingly,

24

Turner's constitutional claims against the individually named Correctional Defendants in their official capacities, as well as his constitutional claims asserted against the North Branch Correctional Institution, are dismissed.

### C.  Injunctive Relief

Turner also seeks injunctive relief.[4]  A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Failure to establish one of these elements is fatal to the request for injunctive relief.  For the reasons discussed below, Turner has failed to demonstrate the likelihood of success on the merits.  Therefore, his request for injunctive relief must be denied.

### D.  Eighth Amendment

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).  To state

---

[4] This relief is not barred by the Eleventh Amendment.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (noting that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'") (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).

an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available.  *See Farmer v. Brennan*, 511 U.S. 825, 834–38 (1994); *see also Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see, e.g.*, *Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition.  *See Farmer*, 511 U.S. at 839–40.  Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'"  *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129

F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk.").  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

Assuming that Turner has established that he suffers from a serious medical need, the record evidence demonstrates that the Correctional Defendants were not responsible for the day-to-day provision of medical care and the record does not support the claim that they were deliberately indifferent to Turner's medical needs.  The record evidence further demonstrates that Dr. Getachew was not deliberately indifferent to Turner's medical needs.

Contrary to Turner's assertions, Dr. Getachew was not responsible for approving Turner's knee surgery when it was recommended in 2018.  Nor was Dr. Getachew responsible for any delay in having that surgery scheduled.  Rather, Turner's medical records show that when Dr. Carls recommended Turner undergo surgery to remove the bursa in his knee, it was medically necessary for Turner to first be cleared by a cardiologist given Turner's established heart issues.  While some delay occurred in scheduling Turner's evaluation by a cardiologist, during this same delay Turner repeatedly engaged in self-harm by cutting himself and removing sutures, thus reopening his wounds.  As such, his medical providers reasonably believed that there was a risk that he would remove his surgical sutures if the knee surgery proceeded.

With this background in mind, Turner's care providers convened a multi-disciplinary care committee to determine the best means to treat Turner's multiple health issues taking into account his self-injurious behavior.  Turner participated in the care conference and agreed with the committee that he could only move forward with both treatment for HCV and his knee surgery if he complied with his medical and psychiatric treatments and refrained from self-harm for a period of six months.  However, Turner unfortunately was unable to do this.

Turner notes that despite his failure to comply, he nevertheless began HCV treatment and insinuates that he should have also received the knee surgery despite his non-compliance with the agreed-upon care plan.  While Defendants do not directly address Turner's point, it is reasonable that the decision to provide the HCV treatment was merely because Turner's care team determined that the risk of delaying HCV treatment outweighed the risk of Turner's failure to comply with the directives outlined in his care conference.  That Turner received HCV treatment does establish that the failure to provide knee surgery represented deliberate indifference to Turner's medical needs.

In fact, the record evidence demonstrates that Turner's bursitis fortunately resolved on its own, thus obviating the need for surgery.  While Turner maintains that the referral for surgery in 2018 should have been effectuated, his medical providers disagreed and found that the lack of observable swelling or diminished range of motion in Turner's knee reflected that the bursitis resolved on its own.  While the Court is mindful of Turner's understandable frustrations with his delay in recommended treatment and acknowledges that he may have rightfully been confused as to why no knee surgery was scheduled, none of the named Defendants were responsible for that delay or deliberately indifferent to his serious medical needs in delaying the surgery.  As such, they are each entitled to summary judgment.

## IV.      CONCLUSION

For the foregoing reasons, Defendants' motions, ECFs 15, 20, construed as motions for summary judgment are granted.  Judgment will be entered in favor of Defendants Getachew, Arnold, and Doe.  The Complaint is dismissed as to NBCI.

A separate Order follows.


Dated: <u>July 3, 2024</u>                                                    <u>            /s/            </u>
                                                                   Brendan A. Hurson
                                                                   United States District Judge